UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

WILLIAM and MARTHA MILLSAPS          )
                                      )          Case No. 1:11-CV-226
                    *Plaintiffs*,     )
                                      )          Judge Curtis L. Collier
v.                                    )
                                      )
DEPUTY RONNIE LANDCASTER, *et al.*,   )
                                      )
                    *Defendant*s.     )

# M E M O R A N D U M

Before the Court are two motions for summary judgment.  Defendants Virgil McNeece

("Chief McNeece"), Police Chief of the Monteagle, Tennessee Police Department, and Monteagle,

Tennessee ("Monteagle") seek summary judgment on Plaintiffs William and Martha Millsaps'

("Plaintiffs") excessive force and unlawful arrest claims, as well as a variety of state law claims

asserted against Defendants (Court File No. 44).  Defendant Chris Ladd ("Officer Ladd")[1] also seeks

summary judgment on the same claims (Court File No. 41).  For the following reasons, the Court

will **GRANT** the motion filed by Chief McNeece and Monteagle (Court File No. 44), and will

**GRANT IN PART** and **DENY IN PART** Officer Ladd's motion (Court File No. 41).  This case

will proceed on Plaintiffs' unlawful seizure, false imprisonment, official oppression, and trespass

claims against Officer Ladd.

## I.       FACTUAL BACKGROUND[2]

---

[1] Although the Court refers to Ladd as an officer in this memorandum, he is apparently now a deputy with the Marion County Sheriff's Department.

[2] Some of the factual matter discussed in this section relies on the allegations in the complaint, because Defendants do not offer evidence to refute the allegations nor do they appear to dispute them.  Where factual disputes do exist, the Court relies on the evidence presented by the parties.

Plaintiffs William and Martha Millsaps live near Monteagle, Tennessee. William Millsaps is a retired Episcopal Bishop. Their son, James Millsaps, lives in Florida, and is father to three children,[3] two boys and one girl. Although James Millsaps' ex-wife, Bridget Millsaps, had legal custody of the children,[4] he retained visitation rights, which required the children to spend time at his home in Florida. In August 2010, the boys were staying at James Millsaps' home, and Plaintiffs were visiting as well. Plaintiffs allege Bridget Millsaps informed James she no longer wanted two of the children, both boys, to live with her, and she "wrote a document" releasing the children to James.[5] After Bridget Millsaps left the boys in Florida, James went on a previously planned business trip, leaving the boys in the care of Plaintiffs. Plaintiffs then returned to Tennessee with their grandchildren.

On August 30, 2010, three deputies of the Marion County Sheriff's Department arrived at the Millsaps' residence with Bridget Millsaps. Presenting a North Carolina custody order[6] that provided Bridget Millsaps with primary custody, the deputies ordered the children be given to Bridget Millsaps. Although not entirely clear to the Court, during this encounter the deputies apparently were placed in contact with two attorneys to discuss the custody situation, and informed the Millsaps the children could remain with them. Plaintiffs allege the deputies told Bridget

---

[3] Although the Third Amended Complaint lists three children resulting from James Millsaps' marriage to Bridget Millsaps, the North Carolina custody order only mentions the two boys.

[4] Following the events of this case, James apparently obtained legal custody of the boys.

[5] This document has not been provided to the Court, but Defendants do not appear to refute this transaction occurred. A letter from Bridget Millsaps to the Marion County Sheriff was offered in which she discusses the arrangement for the boys to live with their father and explains her decision to renege on the agreement.

[6] A copy of this order was provided the Court as an exhibit to William Millsaps' deposition (Court File No. 44-2, Ex. 1).

Millsaps to return to North Carolina, and told the Millsaps the situation was resolved.

Later that day, while Plaintiffs were away from home, a deputy of the Grundy County Sheriff's Department called William Millsaps on his cellular phone. He claimed to be in the Millsaps' driveway and threatened to arrest William Millsaps if he did not return home that evening. The Millsaps later received a call from a friend informing them that a number of officers were planning to "attack" their home. William Millsaps called Chief McNeece to discuss the situation, who informed Plaintiffs he would take no action to retrieve the children from the household. Chief McNeece contacted the Sheriff of Marion County who related his intention not to take action without a Marion County court order (Court File No. 44-1, Chief McNeece Aff.). Chief McNeece informed William Millsaps of the Sheriff's statement.

However, around 8:00 p.m., two Marion County Sheriff's Department deputies and Officer Ladd, a Monteagle police officer who was out of Monteagle's jurisdiction, arrived at Plaintiffs' residence. According to Officer Ladd, one of the Marion County deputies informed him of a court order establishing Bridget Millsaps' custody rights with respect to the children, and further informed him a Juvenile Court Judge had inspected the order and informed the deputies to retrieve the children (Court File No. 41-5, Officer Ladd Aff., ¶ 6). Officer Ladd claims he was asked to accompany the deputies as a witness (*id.* at ¶ 7). After dismantling a gate, the three law enforcement officials knocked on the Millsaps' door. Although William Millsaps apparently testified Martha Millsaps let the officers in the home,[7] Martha Millsaps testified that after the officers "slammed their

---

[7] This portion of William Millsaps' deposition was not provided to the Court. However, in Martha Millsaps' deposition she stated she "disagree[d] with [William] saying that I let the deputies in the house. I did not let the deputies in the house" (Court File No. 44-3, Martha Millsaps Dep., p. 19). Presumably, William Millsaps testified Martha Millsaps allowed law enforcement to enter.

fists up against the door . . . like a sledgehammer," she opened the door and the officers "galloped" into the house without permission (Court File No. 44-3, Martha Millsaps Dep., p. 19).

After the officers entered, Plaintiffs allege they were "threatened and brutalized." However, it is undisputed Officer Ladd did not touch either Plaintiff during this encounter. Martha Millsaps claims to have been hit by one of the officers. The Third Amended Complaint states the officers "attempted to break [her] arm to prevent her from calling her attorney." According to a statement of Rhonda Pilkington, a family friend who was present during the incident, when Martha Millsaps called her lawyer and offered the phone to one of the deputies, he pushed Martha Millsaps' arm back to avoid speaking with the attorney (Court File No. 55-3, Pilkington Stmt.). In Martha Millsaps' interrogatory answers, she states one of the officers, Deputy Adam Blevins, "hit me with a blow to the arm as he resisted the phone being held out to him - he was like an enraged, mindless animal, as were the others" (Court File No. 55-5, p. 16).

The officers demanded the boys be turned over to them. When the Millsaps asked to see warrants, the officers refused to provide any. The Millsaps then sought their names and badge numbers. Officer Ladd informed the Millsaps he was there "for back up." While the other officers removed the boys from the home, apparently in a great amount of distress, Officer Ladd threatened the Millsaps with arrest (Court File No. 44-3, Martha Millsaps Dep., p. 22), and stood in the Millsaps' kitchen, which intimidated the Millsaps (Court File No. 44-2, William Millsaps Dep., p. 42) ("I don't think I would have walked out of that kitchen with him standing there."). When the Millsaps asked him to call Chief McNeece, he refused, stating, "If he didn't want me to be here, he should have told me beforehand" (Court File No. 44-3, Martha Millsaps Dep. p. 21). During the incident, William Millsaps called Chief McNeece to inform him the officers had arrived, contrary

to what he had promised earlier in the day. It was during this phone call that Chief McNeece first learned of Officer Ladd's presence at the Millsaps' residence (Court File No. 44-1, Chief McNeece Aff.). Finally, the boys were removed from the home.

Following this incident, on September 14, 2010, Officer Ladd was advised to, and did, resign as a Monteagle police officer during a Monteagle City Council meeting. During this meeting, Chief McNeece presented the city council written reprimands regarding two unrelated instances during which Chief McNeece claimed Officer Ladd lost control of his anger, both of which occurred before the incident at issue in this case. Officer Ladd attended the meeting in his own defense, and mentioned the incident at the Millsaps' home as the real reason Chief McNeece wished to see him terminated:

> [A conversation mentioned by Chief McNeece] followed an incident that took place in the Clifttops [sic] where Deputy Keith Cox actually requested my assistance in the removal of two children from Bishop Millsaps' residence, who was the grandfather of these kids. Had a written signed document from a judge in North Carolina, I believe it was. Had the document second read by a local judge, Judge Blevins from Marion County, who okayed the document, said it was valid, action could be taken at any time on it.
>
> So Keith requested my assistance to come out to Clifttops [sic], which was no more than a hop, skip and a jump inside the gate, no further than we go into the Grundy County housing projects for Grundy County all the time on emergency and non-emergency calls.
>
> It's a constant thing that goes on up here. We are in total agreement with each department with it. I've been told by Chief McNeece I do not have to consult him on every little incident where we just go outside the city limits a little bit.
>
> So I took it upon myself, it was a situation where I was going to be nothing more than an observer. That's all I did. We proceeded to the residence, removed the kids without incident, other than the grandparents, you know, escalating it into a more irate situation for us, made our job harder than it should have been.
>
> Mr Millsaps claimed that that day that he would see to it, before this was over, that he would see that all three of us officers lost our jobs or was removed -- removed from service, was calling both of our supervisors.
>
> Previously [sic] to that statement from Bishop Millsaps, about a week prior to that, I was approached by Chief McNeece in the morning and he told me that I needed to start hunting me another job, and that if another department was ready to take me on,

I needed to do and do so quickly, that the mayor of Monteagle was headhunting me, and she was out to fire me just as soon as she possibly could. And that's basically where that ended.

. . . .

But the conversation on the phone was a - - was where he called me following me getting back from the deal out at Clifttops [sic], he called me to bless me out over going out there. And his very words were, roughly, from my memory, was "What are you doing outside the city limits? You know you're not supposed to go out there." And I said "Well, we do it all the time for Grundy County, we do it pretty much for everybody around here. You've never said nothing about it.[" "]Well, you shouldn't have went out there." And he said, "I promised Mr. Millsaps that those kids would not be removed from that residence." And I said, "Well, you know, they had a document from a judge in North Carolina". He said, "I don't care if they have a document from a judge in North Carolina. We don't honor documents from judges outside the State of Tennessee."

And I question him on what in the world was he talking about. You know, it's the same as an arrest warrant that's issued from Minnesota or Alaska or wherever, it's valid, it doesn't matter what state you're sitting in.

He followed up by saying that what I did was - - when I went out there to help Marion County, all we did was make him look like a liar to Bishop Millsaps, that [Marion County Sheriff] Bo Burnett promised him that those kids would not be removed. I told him at that time, "That's an issue you need to take up with the sheriff of Marion County, not me. You know, if I've done anything wrong other than that, nobody advised me before shift started that I was not to go partake in any of that."

(Court File No. 41-1, city council Tr., pp. 14-19). A councilman then inquired why Officer Ladd needed to help the deputies. Deputy Cox was present at the meeting, who stated he asked Officer Ladd to accompany them because he wanted a witness, explaining "these things do escalate. I was the one there from the other department . . . and that's why he was there. No other reason but for that, as a witness to impartiality as to what was going on" (*id*. at p. 21). Following some discussion, the city council moved to accept Officer Ladd's resignation, if he would offer it. Officer Ladd then agreed to resign as soon as possible, but noted that he thought it was "a poor and pitiful thing" that he was being asked to resign over "a bunch of garbage" and that "Bishop Millsaps is making the call on this right here, that you have a supervisional [sic] problem in your department and it's a'going

downhill fast" (*id.* at p. 37).

On August 25, 2011, Plaintiffs filed suit against Chief McNeece, Officer Ladd, and Monteagle. The suit also originally listed, Deputies Ronnie Landcaster, Amanda Campbell, Ronald Zirk, Keith Cox, and Adam Blevins; Sheriff Bo Burnett; and Officer Ray Bradford as defendants, but the parties later stipulated to the dismissal of these parties (Court File No. 46). The Third Amended Complaint makes the following federal claims against the remaining Defendants:

> Plaintiffs allege that all Defendants are guilty of a knowing and intentional violation of their rights as guaranteed under the fourth and fifth amendments to the United States Constitution as to be free from unnecessary and illegal arrest and the use of excessive and unnecessary force and seizure under color of state law as guaranteed by the provisions of 42 USC 1983, et seq. They also allege that they are entitled to recover their damages, costs and attorney fees under 42 USC 1988.

(Court File No. 14, Third Am. Compl.). Plaintiffs also allege state law claims of assault, battery, false arrest, false imprisonment, trespass, and official oppression against Defendants. Additionally, Plaintiffs claim Officer Ladd committed libel by disseminating a letter written by Bridget Millsaps regarding the incident and by his statement during the September 14, 2010 city council meeting. Defendants filed timely motions for summary judgment.

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

However, the non-movant is not entitled to a trial based merely on its allegations; it must submit significant probative evidence to support its claims. *See Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should enter summary judgment. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III.    DISCUSSION

Plaintiffs allege federal claims under the Fourth and Fifth Amendments to the United States Constitution and 42 U.S.C. § 1983. Plaintiffs also allege a number of state law claims. The Court will consider Plaintiffs' federal claims first.

### A.    Federal Claims

To state a general claim under 42 U.S.C. § 1983, a plaintiff must "demonstrate that a person acting under color of state law 'deprived [him] of rights, privileges or immunities secured by the Constitution or laws of the United States.'" *Barker v. Goodrich*, 649 F.3d 428, 432 (6th Cir. 2011) (citing *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)). Accordingly, the Court must determine whether Plaintiffs have demonstrated a deprivation of rights secured by the Constitution.

### 1. Fourth Amendment

Plaintiffs allege two violations of the Fourth Amendment: unlawful arrest and excessive force. Important to the resolution of Defendants' motions, Plaintiffs do not challenge the initial entry into their home as an unlawful search. With that understanding in mind, the Court will consider both of Plaintiffs' Fourth Amendment claims in turn.[8]

### a. Unlawful Seizure

Plaintiffs do not contend they were ever formally arrested. However, they do allege they were detained while the deputies located and removed the children. Accordingly, although Plaintiffs allege "an unlawful and illegal arrest," they also allege an "unnecessary . . . seizure," and the Court construes Plaintiffs' claim to assert they were unlawfully seized.

"[T]he Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). A seizure occurs when a reasonable person would not feel free to leave an encounter with the police. *Florida v. Bostick*, 501 U.S. 429, 438-39 (1991); *United States v. Campbell*, 486 F.3d 949, 956 (6th Cir. 2007); *Bennett*, 410 F.3d at 834. In a typical seizure, this occurs when a government actor has, "by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (citing *Terry*, 392 U.S. at 19, n.16). "[T]he test

---

[8] Officer Ladd argues Plaintiffs' complaint should be dismissed under *Marcilis v. Twp. of Redford*, 693 F.3d 589 (6th Cir. 2012), because the complaint alleges generally "Defendants" violated the Fourth and Fifth Amendments without specifying which defendants. However, in *Marcilis*, the plaintiff only listed the names of the defendants individually when identifying them as officers of the Drug Enforcement Agency. Otherwise, all the factual allegations in the complaint referred to the defendants' actions collectively. Here, on the other hand, Plaintiffs' complaint contains detailed factual allegations regarding the individual Defendants' actions. The use of the collective "Defendants" in the paragraph alleging violations of the constitution on the basis of those factual allegations does not fall under the "generalized pleading" doctrine discussed in *Marcilis*.

for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.*, 499 U.S. 621, 628 (1991). There must be "a governmental termination of freedom of movement through means intentionally applied." *Scott v. Harris*, 550 U.S. 372, 381 (2007); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998); *Ciminillo v. Streicher*, 434 F.3d 461, 465 (6th Cir. 2006). In determining whether a seizure has occurred, some relevant factors to consider include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Officer Ladd argues the evidence presented is insufficient to establish a seizure occurred. He argues no use of force or show of authority was used to compel the Millsaps to remain in their home, and they were merely instructed not to interfere with the confiscation of their grandchildren. Further, he argues he was there merely as a witness and the Millsaps were free to leave the home at any time during the search and removal of the boys. Officer Ladd points to a Third Circuit case, *James v. City of Wilkes-Barre*, 700 F.3d 675 (3d Cir. 2012), for support. In *James*, a fifteen-year old individual sent a text message to a friend disclosing her intention to commit suicide. After the friend called 911, officers arrived at the residence with emergency personnel. The minor's parents discussed the situation with their daughter, who confirmed her friend's story but explained she decided not to attempt suicide. The officers, however, insisted on transporting the child to a hospital for evaluation. After the minor's parents disagreed, the officers threatened to charge them with assisted manslaughter in the event something happened to their daughter. The parents then

acquiesced to the officers' demands and allowed their daughter to be transported to the hospital. The officers told the parents one of them would need to accompany the daughter to the hospital. After first refusing, the mother finally agreed to go to the hospital in light of the officers' persistence.

Following these events, the mother filed a § 1983 suit against the officers alleging false arrest and imprisonment. The district court granted the officer's Rule 12(b)(6) motion, concluding the mother failed to state a claim on which relief could be granted. In considering her false arrest claim on appeal, the Third Circuit affirmed the district court. The court concluded "the officers' insistence that Mrs. James accompany her daughter to the hospital would not cause a reasonable person to feel powerless to decline the officers' request or otherwise terminate the encounter." *Id.* at 681. Because the Supreme Court has made clear approaching citizens with questions or requests does not constitute a seizure, the court concluded the insistence that a parent accompany her daughter to the hospital was insufficient to establish seizure. The court noted the officers did not "intimidate Mrs. James with a threatening presence," engage in physical touching, or display a weapon. *Id.* The officers also did not threaten to arrest her if she refused to accompany her daughter to the hospital, but only threatened to charge her if she refused to release her daughter to the hospital and the daughter later suffered injury. The court concluded no seizure occurred on the facts alleged.

Officer Ladd argues this case supports his argument no seizure occurred in this case. However, the Court concludes *James* is distinguishable. In *James* the court relied on its conclusion the police officer's "insistence" was similar to cases in which officers have approached citizens with questions or requests. *Id.* at 681. The court found it important there was no intimidation with a threatening presence, display of weapon, or threat of arrest. *Id.* at 682. Here, on the other hand, Martha Millsaps testified the officers forced their way into the house (Court File No. 55-7, Martha

Millsaps Dep., p. 48). She counted four police cars at the residence during the encounter (*id.* at p. 49). The Millsaps also claim the deputies were in "SWAT gear," rather than regular police uniforms. William Millsaps testified that Officer Ladd stayed with him in the kitchen and he did not feel entitled to leave the kitchen during the incident (Court File No. 55-8, William Millsaps Dep., p. 42). William Millsaps' subjective interpretation is insufficient to establish seizure. However, he testified that he believed all the officers, including Officer Ladd, instructed him not to move, although he admitted he did not remember the exact words used (*id.*) ("COUNSEL: Did he ever tell you not to move?; MILLSAPS: I think they all did. COUNSEL: You think?; MILLSAPS: Yes."). William Millsaps testified Officer Ladd did not threaten to arrest him (*id.* at pp. 44-45), but Martha Millsaps claims Officer Ladd threatened to take her to jail (Court File No. 55-7, Martha Millsaps Dep., p. 22). Martha Millsaps also testified Officer Ladd had his hand on his weapon (*id.* at p. 21). When the children were taken outside, the Millsaps claim in their answers to interrogatories that they were told to "Get back in the house. Stay in your house" (Court File No. 55-6, p. 29).

The Court concludes a question of fact remains regarding whether Plaintiffs were seized during the search of their home. This is, admittedly, a close case. If, as Officer Ladd argues, a jury were to conclude the Millsaps were merely instructed not to interfere with the removal of the children, and a reasonable person in their position would otherwise feel free to leave the home, then no violation occurred. If, however a jury were to believe the Millsaps' story, it could conclude the deputies and Officer Ladd entered the house without authority and detained the Millsaps in the kitchen while searching for the children. Such a detention is a seizure under the Fourth Amendment. *See Michigan v. Summers*, 452 U.S. 692, 696 (1981) (holding pre-arrest detention during search of

defendant's home was a seizure within the meaning of the Fourth Amendment because he was not free to leave); *Ingram v. City of Columbus*, 185 F.3d 579, 591-92 (6th Cir. 1999) (handcuffing and detention with display of firearms during search of a home was a seizure); *see also Mendenhall*, 446 U.S. at 554 (listing relevant circumstances that indicate a seizure as "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled").

The Supreme Court's decision in *Summers* is particularly instructive. *Summers* established law enforcement's authority to detain an individual in his or her home during execution of a search warrant. Although such detentions do not violate the Fourth Amendment, the Court explicitly found a pre-arrest detention during a search was a "'seizure' within the meaning of the Fourth Amendment. . . . [because] the record demonstrates that respondent was not free to leave the premises while the officers were searching his home." 452 U.S. at 696. In *Summers*, officers arrived at the defendant's home to execute a search warrant. Encountering him on the front steps, the officers eventually obtained forcible entry of his apartment after the occupants refused to open the door. All eight occupants were detained pending the search, which uncovered narcotics. The defendant, who was detained on his front steps during the search, was found to have heroin on his person. Although the Court concluded the detention was reasonable, the Court's analysis clarifies such a detention is in fact a seizure within the meaning of the Fourth Amendment. Accordingly, were a jury to believe the Millsaps in this case and conclude a reasonable person would not have felt entitled to leave the kitchen or, more broadly, the home during the search, the detention would constitute a Fourth Amendment seizure.

This conclusion is not dispositive of the issue, because only unreasonable seizures violate the Fourth Amendment. However, the Supreme Court has held "the Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." *Payton v. New York*, 445 U.S. 573, 576 (1980) (internal citations omitted). That reasoning also applies to misdemeanors. *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 689 (6th Cir. 2006). "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. District Court (Keith)*, 407 U.S. 297, 313 (1972). "Thus, a warrantless search or seizure inside a home by a law enforcement officer violates the Fourth Amendment unless an exception to the warrant requirement applies." *Andrews v. Hickman Cnty.*, 700 F.3d 845, 854 (6th Cir. 2012); *see also Payton*, 445 U.S. at 590 ("In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.").

Accordingly, were a jury to conclude a seizure occurred, the seizure would necessarily violate the Fourth Amendment in this case.[9] Although the Supreme Court's decision in *Summers*

---

[9] In *Turk v. Comerford*, 488 F. App'x 933, 945-46 (6th Cir. 2012), a warrantless search of the plaintiff's home was deemed constitutionally invalid. The district court had dismissed the plaintiff's seizure claim under *Summers*, but because the Sixth Circuit found the search unconstitutional it considered the issue. The court concluded the detention during the search was an unconstitutional seizure and denied qualified immunity. The court relied upon a finding the police had no probable cause or reasonable suspicion to detain the plaintiff. The Court, however, does not read the holding in *Turk* to suggest reasonable suspicion or probable cause would justify an in-home seizure without a warrant. Thus, as has been stated, a detention during a warrantless search of an individual's home constitutes a Fourth Amendment violation absent an exception to the warrant requirement. *Andrews*, 700 F.3d at 854 ("[A] warrantless search or seizure inside a home by a law enforcement officer violates the Fourth Amendment unless an exception to the warrant

established police may detain residents of a home during execution of a valid search warrant, no such warrant was obtained here. There is a suggestion a Juvenile Court Judge was consulted regarding the North Carolina custody order. However, Defendants merely allege the Judge stated the order was effective, not that he signed a search warrant or otherwise approved of the entry to Plaintiffs' home. For all the Court knows, no judicial officer was aware of or approved the search and seizure. Even had the Judge provided oral approval of entry into the home, such approval would fail to satisfy constitutional requirements. *See O'Donnell v. Brown*, 335 F. Supp. 2d 787, 801-02 (W.D. Mich. 2004) (holding a statutory provision empowering a state judge to order seizure of a child does not provide police authority to enter a home to effect the seizure, which requires a warrant that satisfies the Fourth Amendment); *see also Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 809 F. Supp. 2d 754, 771-72 (N.D. Ohio 2011) (standing juvenile court order and temporary emergency care order insufficient to justify warrantless entry). Although Officer Ladd cites *Storck v. City of Coral Springs*, 354 F.3d 1307 (11th Cir. 2003) for the proposition a custody order empowers an officer to enter a private home, that case involved a separate order specifically empowering the sheriff to take the child into custody and enter any home in which the sheriff believed the child to be residing. In this case, however, the custody order relied upon is a divorce decree establishing Bridget Millsaps' primary custody and does not empower any officer to enter into a home to enforce it.[10]

---

requirement applies.").

[10] Moreover, there is no suggestion the provisions of the Tennessee Code establishing procedure for the enforcement of a foreign custody order were followed. *See* Tenn. Code Ann. § 36-6-229; *Cliburn v. Bergeron*, Nos. M2002-01386-COA-R3-CV, M2001-03157-COA -R3-CV, 2002 WL 31890868, at *15 (Tenn. Ct. App. Dec. 31, 2002) ("Once the foreign decree is registered, a petitioner can seek enforcement of the foreign order by using the procedure established in Tenn.

As the Supreme Court in *Payton* made clear, without a warrant or exigent circumstances plus probable cause, no seizure in an individual's home will pass constitutional muster. *Payton*, 445 U.S. at 586 ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."); *see also Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) ("As *Payton* makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home."). Here, the alleged seizure occurred inside Plaintiffs' home, and no warrant was issued to lawfully enter the residence. Nor have Defendants asserted exigent circumstances supported the entry. Indeed, there is no allegation the children were in danger or were likely to be removed from the area. Deputies had, only a few hours previously, established the safety of the children with Plaintiffs, and instructed Bridget Millsaps to return to North Carolina. Regardless of whether probable cause existed to search the residence, the deputies and Officer Ladd had no warrant to do so and no exigency to justify their failure to obtain a warrant. Because of this failure, any subsequent seizure violated the Fourth Amendment.

Accordingly, Plaintiffs have provided sufficient evidence to establish an unlawful seizure in violation of the Fourth Amendment.

### b. Excessive Force[11]

---

Code Ann. § 36-6-232 . . . .").

[11] The Court notes unlawful seizure and excessive force are separate claims, and a finding a seizure is unlawful does not necessarily establish an excessive force claim. *See Nails v. Riggs*, 195 F. App'x 303, 313 (6th Cir. 2006) ("The issues of whether there was probable cause to arrest and whether excessive force was used are distinct."). Although *Nails* relied on *Cortez v. McCauley*, 438 F.3d 980, 995 (10th Cir. 2006), which was later reversed in part en banc, 478 F.3d 1108 (10th Cir. 2007), the en banc opinion also stated "in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force." *Cortez*, 478 F.3d at 1126.

In order to bring a successful claim of excessive force, which is properly analyzed under the Fourth Amendment, Plaintiffs must "demonstrate that a seizure occurred, and that the force used in effecting the seizure was objectively unreasonable." *Rodriguez v. Passinault*, 637 F.3d 675, 680 (6th Cir. 2011). The Court must view the "facts and circumstances of the case" from the "perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007) (citing *Graham v. Connor*, 490 U.S. 386, 395-96 (1989)). Indeed, "an officer making an . . . arrest has the right to use some degree of physical coercion or threat thereof to effect it." *Id.* (internal citations omitted). In other words, the Court must determine whether the officer's use of force was "objectively reasonable" under the "totality of the circumstances." *Id.* at 236-37. To make such determination, the Court should consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010) (citing *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001)). This is not an "exhaustive list," and the inquiry ultimately turns on whether the seizure was reasonable under the "totality of the circumstances." *Slusher v. Carson*, 540 F.3d 449, 455 (6th Cir. 2008).

However, in this case Plaintiffs concede Officer Ladd never used any force at all. Rather, Plaintiffs argue Officer Ladd is liable for use of excessive force because he "refused to call down another officer who hit Martha Millsaps in his presence." However, as the Supreme Court has made clear, "[a]bsent vicarious liability, each Government official . . . is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Nevertheless, Plaintiffs argue the Sixth Circuit has stated "there are circumstances under which police officers can be held liable for failure

to protect a person from the use of excessive force." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). In such cases, "a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Id.* Even if this doctrine survives *Iqbal*,[12] Plaintiffs have failed to satisfy it. Plaintiffs do not dispute Martha Millsaps was touched once by a deputy when she offered him a phone to speak with her attorney. There is simply no evidence to suggest Officer Ladd could have known this would happen or had any opportunity to prevent it. Indeed, because the contact apparently came as a result of Martha Millsaps' offer of the phone, which the deputies could not have anticipated, there is no evidence on which a jury could find Officer Ladd had reason to know such force would be used. Officer Ladd could hardly have prevented spontaneous contact. Accordingly, Plaintiffs fail to establish excessive force for which Officer Ladd was responsible.

Plaintiffs also argue his mere presence in the home was excessive force. Plaintiffs cite *Cassady v. Tackett*, 938 F.2d 693 (6th Cir. 1991) for the proposition threatened use of force is a cognizable Fourth Amendment claim. In *Cassady*, coworkers at a Kentucky jail became embroiled in conflict. The defendant eventually restricted the plaintiff to a portion of the jail and threatened her by drawing back his coat and revealing his firearm. In concluding the plaintiff's § 1983 claim should proceed to trial, the Sixth Circuit concluded "[n]ot every threat will arise to the level of a constitutional violation, of course. But where the credibility of the threats presents a jury question as to whether the threats foreseeably resulted in the seizure of the person, a constitutional violation

---

[12] *See Kowolonek v. Moore*, 463 F. App'x 531, 539 (6th Cir. 2012) (applying this test post-*Iqbal* without considering *Iqbal*'s impact); *Cole v. City of Dearborn*, 448 F. App'x 571, 577 (6th Cir. 2011) (same).

can occur." *Id.* at 697. However, the Court has already concluded Plaintiffs have presented evidence to proceed to trial on their unlawful seizure claim. To the extent *Cassady* also deals with excessive force, the Court notes it involved explicit threats of physical violence, which did not occur in this case. Further, although some courts have held actual physical contact is not required to state an excessive force claim, *see Martin v. Bd. of Cnty. Comm'rs. of the Cnty. of Pueblo*, 909 F.2d 402, 406 (10th Cir. 1990) ("[C]ourts have recognized excessive force claims where the force is expressed by means other than physical contact."), the Sixth Circuit has intimated lack of physical contact might doom any excessive force claim, *see Burnette v. Gee*, 137 F. App'x 806, 810 (6th Cir. 2005) ("Sheriff Gee's charge towards Wilson cannot itself be construed as excessive force, as it did not involve any physical contact between Gee and Wilson."). *See also Estate of Owensby v. City of Cincinnati*, 385 F. Supp. 2d 626, 663-63 (S.D. Ohio 2004) ("All of the Sixth Circuit cases elucidating and evaluating whether Fourth Amendment claims exist, however, clearly involve some element of physical contact, even if it is arguably de minimis. . . . Indeed, it seems axiomatic that an excessive force claim may not lie against those who did not use excessive force in violation of the Fourth Amendment.") (citations omitted).

Regardless, the Court concludes Officer Ladd did not use any force in an objectively unreasonable manner. The most significant allegation before the Court, the placement of Officer Ladd's hand on his weapon, does not rise to the level of objectively unreasonable force in this case. Construing the evidence in the light most favorable to Plaintiffs, Officer Ladd seized them in their home by a show of authority which may have included placing his hand on his holstered weapon. Although *drawing* a weapon might be so unreasonable as to constitute excessive force, *see Robinson v. Solano Cnty.*, 278 F.3d 1007, 1014-15 (9th Cir. 2002), the Court is aware of no case that has

found an officer's placement of his hand on a holstered weapon violates the Fourth Amendment. Nor have Plaintiffs cited any such case. Moreover, although the circumstances of this case suggest no risk to the safety of the officers or significant criminal activity, the parties do agree the events in the Millsaps' residence were chaotic and the Millsaps themselves were distraught. Officer Ladd's show of authority was not so excessive in that context as to implicate the Fourth Amendment's protection against the use of excessive force.

Accordingly, the Court concludes summary judgment is appropriate for Defendants on Plaintiffs' excessive force claim.

## 2. Fifth Amendment

Defendants must be granted summary judgment on Plaintiffs' Fifth Amendment claim. The Fifth Amendment, which states that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law" is only applicable to actions of the federal government. *Scott v. Clay Cnty.*, 205 F.3d 867, 873 n.8 (6th Cir. 2000). Defendants in this case acted pursuant to state and local law. Moreover, Plaintiffs' federal claim only alleges unlawful arrest and excessive force, both of which are valid claims under the Fourth Amendment. Were the Court to generously construe Plaintiffs' Fifth Amendment claims properly to assert Fourteenth Amendment claims, it would still be required to grant judgment in favor of Defendants. Although the Fourteenth Amendment is applicable in excessive force cases that do not fall under the Fourth Amendment, where excessive force is alleged "in the course of an arrest, investigatory stop, or other seizure" a court must analyze the claim "under the rubric of the Fourth Amendment as opposed to the Fourteenth Amendment." *Ciminillo v. Streicher*, 434 F.3d 461, 465 (6th Cir. 2006) (citing *Graham*, 490 U.S. at 395). Because Plaintiffs' claim arises from an alleged unlawful seizure, their excessive force claim must be

analyzed under the Fourth Amendment. Defendants are entitled to summary judgment on Plaintiffs' Fifth Amendment claim.

### 3. Liability

The Court's conclusion a question of fact remains regarding Plaintiffs' Fourth Amendment seizure claim does not end the Court's inquiry. The Court must now consider whether the individual and municipal defendants may be held liable for this violation. The Court will consider each Defendant separately.

#### a. Officer Ladd

Officer Ladd has asserted the defense of qualified immunity. The qualified immunity doctrine shields government officials performing discretionary actions from civil damages liability as long as their actions reasonably could have been thought consistent with the rights they are alleged to have violated. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Even if a government official deprives a plaintiff of a federal right, "qualified immunity will apply if an objective reasonable officer would not have understood, by referencing clearly established law, that his conduct was unlawful." *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The plaintiff bears the burden of showing a defendant is not entitled to qualified immunity. *See Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

To determine if qualified immunity applies, courts employ a two-part test. First, courts determine whether the facts, taken in a light most favorable to the party alleging injury, show an

officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[13]

Second, if a Constitutional right was violated, courts must determine "whether the violation involved a clearly established constitutional right of which a reasonable person would have known." *Peete v. Metro. Gov't of Nashville and Davidson Cnty.*, 486 F.3d 217, 219 (6th Cir. 2007) (citation omitted); *see also Saucier*, 533 U.S. at 201. This second inquiry looks closely at the particular context of the case rather than asking whether a right was clearly established "as a broad general proposition." *Saucier*, 533 U.S. at 201. If a plaintiff fails to establish either of these prongs, he has failed to carry his burden and judgment is appropriate for the defendant. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).[14]

The Court has already concluded Plaintiffs established a question of fact regarding a violation of the Fourth Amendment. The Court must therefore consider whether the violation involved a clearly established right of which a reasonable person would have known. The warrant requirement for the arrest of an individual in his or her home is clearly established. *Denton v. Rievley*, 353 F. App'x 1, 5-6 (6th Cir. 2009) ("*Payton* and *Atwater*[*v. Lago Vista*, 532 U.S. 318 (2001)], taken together, clearly establish that warrantless in-home arrests for misdemeanor offenses

---

[13] In *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Supreme Court held that, although first considering whether a constitutional violation has been established is often beneficial, a court may consider the second prong of the inquiry first in appropriate cases. In this case, however, the Court has considered the inquiries in order.

[14] Because qualified immunity shields reasonable conduct, even when it is mistaken, the Sixth Circuit has at times added a third line of inquiry to the traditional two-part test: "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Peete*, 486 F.3d at 219; *cf. Everson v. Leis*, 556 F.3d 484, 494 n.4 (6th Cir. 2009) (stating regardless of whether the two-prong or the three-prong test is applied, "the essential factors considered are [] the same"). "[I]f officers of reasonable competence could disagree [on the legality of the action], immunity should be recognized." *Malley*, 475 U.S. at 341.

absent consent or exigency violate the Fourth Amendment."). "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *See Payton*, 445 U.S. at 586. Years of precedent, beginning with *Payton* in 1980, established the "firm line" that divides the public from the home. *See Ingram*, 185 F.3d at 586-87 ("[T]he Fourth Amendment 'has drawn a firm line at the entrance to the house,' a threshold which police officers generally may not cross without a warrant."). Moreover, it is clearly established that detaining an individual during a search, even in his home, constitutes a Fourth Amendment seizure. *Summers*, 452 U.S. at 696.

The Court finds guidance in *Duncan v. Jackson*, 243 F. App'x 890 (6th Cir. 2007). In *Duncan*, police were searching for an individual wanted for a number of bank robberies. The Federal Bureau of Investigation sought assistance from local officials in their investigation. Law enforcement then searched the plaintiffs' home without a warrant. Significant factual disputes regarding whether the search was consensual or whether exigent circumstances existed precluded summary judgment. During the search, the individuals present in the home were instructed to remain in the kitchen while a sweep was performed. Two occupants were then sent outside and told to stand by the police vehicles. Some of the occupants alleged they were placed in handcuffs, and one alleged she was directed to place her hands on the vehicle at gunpoint. Other individuals were in the garage, where the sheriff located them and discussed the search with them. Eventually, all the occupants were released and police left the area. The district court concluded qualified immunity was inappropriate given the factual discrepancies.

The Sixth Circuit affirmed. The court noted significant factual disputes precluded summary judgment on the constitutionality of the search and on qualified immunity. Turning to the plaintiffs'

seizure claim, the court noted law enforcement may detain occupants of a home when a proper search is being performed. The court concluded, were the search found to be constitutional, the seizures of the individuals would be reasonable. However, because the legality of the search was still an open question, qualified immunity was inappropriate where the defendants had direct involvement with the alleged seizures. Immunity was even inappropriate for the seizure of the individuals in the garage. The factual dispute at issue with these individuals was summarized by the Court:

> Neither of the[ individuals] was handcuffed, nor was Sheriff Burnett apparently armed. Nonetheless, the plaintiffs testified that Sheriff Burnett entered the garage with the armed FBI agents, addressed Joe Duncan, personally participated in the search, and stayed with them in the garage until the search had been completed. On the other hand, Sheriff Burnett said he arrived only after the FBI had secured the garage, simply conveyed Joe Duncan's consent to the FBI, and stayed to converse with Joe Duncan and the others until the FBI had completed the search.

*Id.* at 897. Given this factual dispute, the court concluded qualified immunity was inappropriate. The allegations here are no less severe than the allegations against Sheriff Burnett in *Duncan*, and in fact appear to be more suggestive of seizure than those allegations. Whereas here Plaintiffs claim they were told not to move and were confined to their kitchen or home, in *Duncan* Sheriff Burnett merely stood with the plaintiffs in the garage. Moreover, Officer Ladd in this case may have had his hand on his weapon, and Sheriff Burnett in *Duncan* was not armed at all. Given the Court's conclusion a question of fact remains regarding whether a seizure occurred in this case, qualified immunity is inappropriate.

Defendant, however, argues he was entitled to rely on information provided to him by the deputies. *See Willis v. Neal*, 247 F. App'x 738, 742-43 (6th Cir. 2007) (holding officer was entitled to rely on collective knowledge of officers at the scene to establish probable cause); *Donta v.*

*Hooper*, 774 F.2d 716, 721 (6th Cir. 1985) (holding officers were entitled to qualified immunity because it was not clearly established they could not rely on a teletype of another jurisdiction that did not recite the existence of an arrest warrant); *see also United States v. Boyd*, No. 94-3433, 1995 WL 541642, at *2 (10th Cir. 1995) ("A police officer must be allowed to rely on a warrant officer for information regarding the existence of a warrant on a specific individual."). However, Officer Ladd states he was told two things: (1) that a court order existed establishing Bridget Millsaps' custody of the children, and (2) that a Juvenile Court Judge had inspected the order and stated it was valid. He may also have been told the Judge informed the officers to retrieve the children. Officer Ladd does not state he was informed a warrant had issued to enter the home or that the custody order entitled the officers to enter the home to enforce it. Nor would it have been reasonable for Officer Ladd to assume an oral statement by a Juvenile Court Judge was sufficient to constitute a search warrant. *See* Tenn. Code Ann. § 40-6-101 ("A search warrant is an order in writing in the name of the state, signed by a magistrate, directed to the sheriff, any constable, or any peace officer of the county, commanding the sheriff, constable or peace officer to search for personal property, and bring it before the magistrate."); Tenn. Code Ann. § 40-6-201 ("A warrant of arrest is an order, in writing, stating the substance of the complaint, directed to a proper officer, signed by a magistrate, and commanding the arrest of the defendant."). Accordingly, even assuming Officer Ladd was entitled to rely on the information the deputies allegedly provided him, his entry into the Millsaps' home and subsequent seizure would still violate clearly established rights.

For these reasons, the Court does not find qualified immunity appropriate in this case for Officer Ladd. The Court therefore **DENIES** Officer Ladd's motion for summary judgment on this ground.

### b. Chief McNeece

Plaintiffs sue Chief McNeece in his individual capacity. Plaintiffs admit Chief McNeece was not aware Officer Ladd was accompanying the deputies until William Millsaps' call during the search. Plaintiffs argue, however, there is a question of fact whether Chief McNeece instituted a policy of allowing officers, including Officer Ladd, to exceed Monteagle's jurisdiction. Further, Plaintiffs argue, Chief McNeece failed to properly instruct his officers "how and when to act outside the jurisdiction and not to violate any rights of citizens."

However, "[p]ersons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior." *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012). The Supreme Court has questioned the existence of supervisory liability under § 1983:

> In a § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

*Iqbal*, 556 U.S. at 677. Moreover, to the extent supervisory liability remains a viable theory under § 1983,[15] Plaintiff's claim still fails. "Supervisory officials are not liable in their individual capacities unless they 'either encouraged the specific incident of misconduct or in some other way

---

[15] *See, e.g.*, *Soto-Torres v. Fraticelli*, 654 F.3d 153, 158 n.7 (1st Cir. 2011) (noting *Iqbal* "may call into question our prior circuit law on the standard for holding a public official liable under § 1983 [and *Bivens*] on a theory of supervisory liability" without deciding the question); *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 n.8 (3d Cir. 2010) ("Numerous courts, including this one, have expressed uncertainty as to the viability and scope of supervisory liability after *Iqbal*.") (collecting cases).

directly participated in it. At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" *Id.* (quoting *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982)). No such evidence has been offered here on which the Court could allow the claims against Chief McNeece in his individual capacity to proceed. Plaintiffs admit he did not authorize or approve this *specific incident* of misconduct, as required under § 1983. This attempt to hold Chief McNeece liable individually "improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability." *Id.* (internal quotation marks omitted).

Accordingly, the Court will **GRANT** Chief McNeece's motion for summary judgment on the § 1983 claims brought against him in his individual capacity.

### c. Monteagle

Plaintiffs bring claims against Chief McNeece and Officer Ladd in their official capacities. When a party brings a suit against an officer in his official capacity, it is construed as a suit against the governmental entity. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). The Court therefore construes the claims against Chief McNeece and Officer Ladd in their official capacities to be a suit against Monteagle, which is also separately listed as a defendant.

A municipality cannot be liable under a *respondeat superior* theory for § 1983 violations. *Cash v. Hamilton Cnty. Dep't of Adult Prob.*, 388 F.3d 539, 542 (6th Cir. 2004). Rather, municipalities are liable when they "have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)). Additionally, even absent a policy "officially adopted" by a municipality's officers, a § 1983 plaintiff "may be able to prove the

existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Praprotnik*, 485 U.S. at 127. A plaintiff bears the burden of showing "that the unconstitutional policy or custom existed, that the policy or custom was connected to the [municipality], and that the policy or custom caused [the] constitutional violation." *Napier v. Madison Cnty.*, 238 F.3d 739, 743 (6th Cir. 2001).

Failure to adequately train or supervise officers can rise to the level of a *de facto* unconstitutional policy or custom if a plaintiff can show: "(1) the training or supervision was inadequate to the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 815 (6th Cir. 2005) (quoting *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Loggins v. Franklin Cnty.*, 218 F. App'x 466, 473 (6th Cir. 2007) (quotation omitted).

Plaintiffs raise the following issues to establish liability for Monteagle: (1) failure to train; (2) failure to supervise; and (3) unconstitutional policy or procedure regarding their failure to train or supervise. These allegations, however, essentially amount to one issue under § 1983: Whether Monteagle had a policy or custom of inadequate training or supervision that caused the alleged

injury. *See Ellis*, 455 F.3d at 701 ("A plaintiff who sues a municipality for a constitutional violation under § 1983 must prove that the municipality's policy or custom caused the alleged injury. One way to prove an unlawful policy or custom is to show a policy of inadequate training or supervision.") (citation omitted).

Much of Plaintiffs' argument in their brief relies on the alleged policy of exceeding the jurisdictional bounds of Monteagle. However, a violation of state or local law does not itself give rise to a constitutional violation, even in the context of jurisdictional limitations. *See Pasiewicz v. Lake Cnty. Forest Preserve Dist.*, 270 F.3d 520, 526 (7th Cir. 2001) ("A violation of a state statute is not a *per se* violation of the federal Constitution. The federal government is not the enforcer of state law."); *United States v. Mikulski*, 317 F.3d 1228, 1233 (10th Cir. 2003) ("Despite the apparent violation of state law, we cannot say that the officers' actions amounted to a federal violation."); *see also United States v. Evans*, 581 F.3d 333, 340 (6th Cir. 2009) (suggesting the defendant's argument government officials' searches and seizures outside of their jurisdiction violates the Fourth Amendment was over broad but not deciding the issue) (quoting *Pasiewicz*, 270 F.3d at 527 ("[A]n officer can act incorrectly with regard to his jurisdiction just as he can act incorrectly with regard to any other factor involved in the exercise of his authority.")). The violation would, however, likely be an issue in determining the reasonableness of the officer's conduct. *See Pasiewicz*, 270 F.3d at 527 ("Such a blatant disregard of state law and the chain of command could weigh on the scales of reasonableness."). But in this case the Court does not see the logical link between the violation that occurred here—seizure without a warrant—and the alleged policy of exceeding Monteagle's jurisdictional bounds. This argument is therefore insufficient to establish municipal liability.

The rest of Plaintiffs' argument rests on alleged prior incidents involving Officer Ladd.

Officer Ladd had been reprimanded twice preceding the incident in this case. The discussion of these incidents at the city council meeting and the actual written reprimands are apparently the only evidence on which Plaintiffs rely to establish the alleged failure to train or supervise. These incidents involved Officer Ladd's "anger issues toward people in general and suspects" (Court File No. 41-1, city council Tr., p. 2). Officer Ladd was written up twice, and following the second reprimand was suspended. The first reprimand stated the following:

> This letter is to inform you that your anger has gotten out of control and can no longer be over looked. On two separate occasions your conduct with people in custody has been overly aggressive. At one point, a prisoner was injured because of your anger and the other occasion your outburst caused an otherwise calm prisoner to become violent. The first incident you were on duty and the second you were not. Consider this letter a formal reprimand.
>
> It is my sincere hope that you will take the opportunity to look at your behavior and make adjustments accordingly. I cannot allow my officers to abuse their authority. Your actions not only affect you, they are felt by me and the entire police department.

(Court File No. 55-9). The second reprimand dealt specifically with the incident at issue here:

> I have been told by several people that Chris Ladd has a anger problem and has been very abusive toward people I have spoken to him about this on several occasions. Another time he and a alderman got into a argument and he cussed him out. Every time he is spoken to about this he states he has freedom of speech and he can talk to anyone in any way he chooses. Then he was off duty and interfered in an arrest that Malhoit and Dees had made, and there statement to me was everything was under control until Chris pulled up and cussed the suspect out and then they had to physically put the suspect in the car. I felt at this time to right him up and explained to him that this was it and he would be suspended. Then he left the city to assist Marion County in Cliff tops and never notified me he was outside the city I called and he said I told he didn't have to I said only in life or death situations. He through his keys down, told the dispatch to call me and have someone come in he quit and was tired of this place. Then beside it in small letters it said signal 9.[16] This was another outburst of anger on his part that shows he cannot control his anger. I felt like suspension was the right thing to do. [sic all]

---

[16] At the city council meeting, Chief McNeece clarified "signal 9" is "police department talk" for "forget about it."

(*id.*).  As noted above, Officer Ladd was asked to resign at the city council meeting during which these issues were discussed.

The Court concludes these two prior incidents are simply insufficient to establish a policy or custom indicating inadequate training or supervision.  To demonstrate a § 1983 violation based upon failure to train, Plaintiffs must show the City was deliberately indifferent to the rights of similarly situated Plaintiffs. To prove deliberate indifference, "[a plaintiff] must show prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005).  The prior instances in this case are insufficient to make this showing.

First, it is unclear from the incidents whether they amounted to unconstitutional conduct. The first instance involved an arrest following a high speed chase.  At the city council meeting, Officer Ladd stated the injuries the suspect obtained occurred during his apparent resistance (Court File No. 41-1, city council Tr., pp. 4-5).  A gunshot wound, which was the suspect's major injury, was not inflicted by Officer Ladd but by the suspect himself.  This story was corroborated by one of the officers on scene during the incident who was present at the city council meeting (*id.* at pp. 30-32).  The second incident involved a suspect who was arrested after assaulting Officer Ladd's cousin.  Officer Ladd went to his cousin's house, while he was off-duty, after hearing about the incident.  When the suspect and Officer Ladd exchanged heated conversation, the suspect had to be escorted to the patrol car (*id.* at p. 8).  From what little information Plaintiffs have provided, the Court can not say these incidents amounted to prior unconstitutional conduct demonstrating notice to Monteagle of a likelihood of further violations or insufficient training.  *See Ellis*, 455 F.3d at 701

(concluding notice of only two possible constitutional violations was insufficient to establish deliberate indifference of a school district).

Second, Monteagle did not ignore the conduct. As demonstrated above, Officer Ladd was reprimanded for what Chief McNeece concluded was conduct that was inconsistent with the expectations he has for his officers. After the instant incident occurred, Officer Ladd was suspended and eventually asked to resign. Moreover, Plaintiffs provide no context for how many reprimands officers typically receive, both in Monteagle and in other jurisdictions, and whether two such reprimands is excessive or would otherwise put a municipality on notice of future misconduct. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 431 (6th Cir. 2005) (holding statistics of excessive force claims are "meaningless" without data establishing the normal number of claims); *see also Peterson v. City of Fort Worth*, 588 F.3d 838, 851-52 (5th Cir. 2009) (holding twenty-seven excessive force complaints is insufficient without context to establish official policy or custom).

The Court also notes Plaintiffs have failed to point to any potentially deficient training program. Plaintiffs bear the burden of establishing the inadequacy of Monteagle's training program. *Campbell v. Anderson Cnty.*, 695 F. Supp. 2d 764, 772 (E.D. Tenn. 2010) ("In order to succeed on such a claim, Campbell must show that the inadequacy of the County's training program was the result of deliberate indifference and that inadequacy is closely related to or actually caused her injuries."). The only evidence before the Court regarding Monteagle's training program is Chief McNeece's affidavit, in which he states Monteagle properly trains its officers (Court File No. 44-1, Chief McNeece Aff.). Plaintiffs have failed to present sufficient evidence to establish a question of fact with respect to Monteagle's training program. *See Fisher*, 398 F.3d at 849 (holding summary judgment appropriate where evidence established adequate training program for officers and plaintiff

failed to provide evidence to establish its inadequacy).

Plaintiffs also point to Officer Ladd's statement during the city council meeting that out-of-state documents, such as arrest warrants, are effective in Tennessee. Presumably, Plaintiffs assert this statement puts this case in the "narrow range of circumstances" identified by the Supreme Court in which a municipality can be held liable for a "single incident" of unlawful conduct because the "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick v. Thompson*, 131 S. Ct. 1350, 1361 (2011) (citing *City of Canton v. Harris*, 499 U.S. 378 (1989)). However, without more context the Court does not find Officer Ladd's statement fits this case into that narrow category. Officer Ladd's statement might indicate a misunderstanding of the law, or with further context it might not. *See* Tenn. Code Ann. § 40-9-104 (codifying authority to make warrantless arrest upon reasonable information suspect stands charged in the courts of another state); *Barton v. Norrod*, 106 F.3d 1289, 1299 n.8 (6th Cir. 1997) ("The UCEA, as codified by both Kentucky and Tennessee, allows for warrantless arrests upon reasonable information that the fugitive would be charged with a crime in the demanding state. *See* Tenn. Code Ann. § 40-9-104 and Ky. Rev. Stat. Ann. § 440.280. These provisions allow for a fugitive to be arrested without a warrant by a peace officer of the asylum state for detention for the reasonable time necessary to enable a requisition for him to be regularly made."). Moreover, without evidence regarding Monteagle's training policy, the Court cannot say Officer Ladd's statement reflects inadequate training.

Because Plaintiffs have failed to establish either an official unconstitutional policy or a *de facto* policy, they have failed to establish municipal liability for Officer Ladd's actions. Accordingly, Chief McNeece's and Monteagle's motion for summary judgment on Plaintiffs' federal

claims will be **GRANTED**.

### B. State Claims

Plaintiffs allege a number of state law claims against Officer Ladd, including assault, battery, false arrest, false imprisonment, official oppression, trespass, and libel. Plaintiffs also claim Chief McNeece and Monteagle are liable under theories of negligence and negligence *per se* for these state law claims except for Plaintiffs' libel claim. The Court will consider each claim separately.

### 1. Chief McNeece and Monteagle

As an initial matter, the Court concludes the motion filed by Monteagle and Chief McNeece should be granted on Plaintiffs' state law claims. The Tennessee Governmental Tort Liability Act ("TGTLA") waives governmental immunity for certain, specified causes of action, including some negligence claims. *See* Tenn. Code Ann. § 29-20-205. The removal of governmental immunity, however, does not apply when the injury arises out of a civil rights violation. *See* Tenn. Code Ann. § 29-20-205(2) (retaining governmental immunity when the injury arises out of "false imprisonment . . . , false arrest, . . . abuse of process, . . . or civil rights").

Such is the case here. Officer Ladd is alleged to have committed the torts in the context of violating the Millsaps' civil rights. Because the Millsaps assert their claims in the context of a civil rights case, the civil rights exception to Tennessee's waiver of governmental immunity applies. *See Campbell*, 695 F. Supp. 2d at 778 (holding governmental immunity for assault and battery claims was not waived, because these claims "are predicated on the alleged violation of [plaintiff's] civil rights by [an officer]"); *Johnson v. City of Memphis*, 617 F.3d 864, 872 (6th Cir. 2010) (favorably citing *Campbell*, and holding that because the plaintiff's negligence claim "arises out of the same circumstances giving rise to her civil rights claim under § 1983," the claim "falls within the

exception listed in § 29-20-205, and the City retains its immunity"). Therefore immunity has not been removed for Monteagle's liability for Officer Ladd's conduct. Monteagle is entitled to summary judgment on Plaintiffs' state law claims.

Plaintiffs attempt to circumvent the civil rights exception by asserting claims of negligence and negligence *per se* against Monteagle and Chief McNeece for Officer Ladd's actions. However, because the underlying actions alleged are civil rights violations, Monteagle is still immune from suit. *See Hale v. Randolph*, No. 1:02–CV–334, 2004 WL 1854179, at *17 (E.D. Tenn. Jan. 30, 2004) ("Hale's negligence *per se* claim is predicated on intentional tortious conduct involving the violation of Hale's civil rights by City police officers. Based on the facts and circumstances in this case, the Court sees no good reason why the City should not have immunity from suit under the 'civil rights' exception in Tenn. Code Ann. § 29–20–205(2)."); *see also Wilkerson v. City of Chattanooga*, No. 1:09–cv–168, 2010 WL 2735689, at *13-14 (E.D. Tenn. July 12, 2010) (holding plaintiff's negligence claim fails both because there was insufficient evidence of negligence in training and supervision and because the claims fell under the civil rights exception).

Plaintiffs also claim Monteagle and Chief McNeece[17] were separately negligent in training and supervising Officer Ladd. *See Evans v. City of Etowah*, No. 1:06-cv-252, 2008 WL 918515, at *11 (E.D. Tenn. April 3, 2008) ("Several lower Tennessee Courts have considered this issue and concluded for a plaintiff to state a claim under the negligence section of the GTLA requires the Plaintiff to point to an independent negligent act of the municipal entity."); *Baines v. Wilson Cnty.*,

---

[17] To the extent Plaintiffs claim negligence on Chief McNeece's part in his individual capacity, Chief McNeece may not be sued. The TGTLA removes liability for the negligent acts of its employees, Tenn. Code Ann. § 29-20-205, and where governmental immunity is removed, the TGTLA precludes a plaintiff from suing the individual employee, Tenn. Code Ann. § 29-20-310(b).

86 S.W.3d 575, 581 (Tenn. Ct. App. 2002) (holding municipal liability may be based on negligence in hiring, training, supervising, or retaining an employee but the plaintiff failed to make such a claim or to allege foreseeability of the employee's actions). However, Plaintiffs rely entirely on the evidence of failure to train and supervise the Court has already rejected.[18] Plaintiffs have offered insufficient evidence to establish this alleged negligence.

Accordingly, the Court will **GRANT** summary judgment in favor of Chief McNeece and Monteagle on Plaintiffs' state law claims.

### 2. Assault[19] and Battery

An employee may not be sued for his actions when governmental immunity has been removed by the TGTLA. Tenn. Code Ann. § 29-20-310(b). Generally speaking, Tennessee has removed governmental immunity for assault and battery actions. *See Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 83-84 (Tenn. 2001) (holding it was error to construe the TGTLA as preserving governmental immunity for assault and battery). However, because of the civil rights exception previously discussed, removal did not occur in this case. Plaintiffs may assert claims of assault and battery against Officer Ladd. *See Campbell*, 695 F. Supp. 2d at 778 (holding governmental immunity for assault and battery claims was not waived, because these claims "are predicated on the alleged violation of [plaintiff's] civil rights by [an officer]").

---

[18] The Court must assume. Plaintiffs failed to discuss the negligence theories at any length in their brief.

[19] Plaintiffs cite in their brief Tenn. Code Ann. § 39-13-101, Tennessee's criminal statute for assault. Plaintiffs appear to allege Officer Ladd is liable for violation of this statute under a theory of negligence *per se*. Regardless, the Court finds, for the reasons stated in consideration of common law assault, Officer Ladd did not "[i]ntentionally or knowingly cause[] another to reasonably fear imminent bodily injury."

"Under Tennessee law, 'assault' is defined as 'any act tending to do corporal injury to another, accompanied with such circumstances as denote at the time an intention, coupled with the present ability, of using such actual violence against that person.'" *Nolan v. Memphis City Schools*, 589 F.3d 257, 265 (6th Cir. 2009) (quoting *Huffman v. State*, 292 S.W.2d 738, 742 (Tenn. 1956) *overruled on other grounds by State v. Irvin*, 603 S.W.2d 121, 123 (Tenn. 1989)). "'Battery' is defined as 'a touching of the person [of an individual] or something intimately associated with, or attached to, his person for an unlawful purpose.'" *Id.* (quoting *Lewis v. Metro. Gen. Sessions Ct. for Nashville*, 949 S.W.2d 696, 703 (Tenn. Crim. App. 1996)).

Plaintiffs did not respond to Defendants' motions for summary judgment on these issues and accordingly the Court is without Plaintiffs' input. However, no factual allegation of which the Court is aware could support a claim of assault or a claim of battery. At most, Officer Ladd placed his hand on his holstered weapon. There is no testimony or allegation Officer Ladd removed the weapon, indicated his intention to remove the weapon, or otherwise led Plaintiffs to believe he was attempting to use his weapon to do them harm. Moreover, it is undisputed no physical contact was made between Officer Ladd and Plaintiffs.

Accordingly, the Court **GRANTS** Officer Ladd's motion for summary judgment on Plaintiffs' assault and battery claims.

### 3. False Arrest

False arrest requires Plaintiffs to prove they were arrested without probable cause. *Lee v. Ritter*, No. 1:02-CV-282, 2005 WL 3369616, *20 (E.D. Tenn. Dec. 12, 2005); *McLaughlin v. Smith*, 412 S.W.2d 21, 26 (Tenn. Ct. App. 1966). Although many lawyers often conflate false arrest and false imprisonment, they are two independent torts. *See Stubblefield v. Hawkins Cnty.*, No.

2:06-CV-129, 2007 WL 4365758, at *5 (E.D. Tenn. Dec. 11, 2007) (discussing the distinction made by Tennessee in the TGTLA). Many courts have also referred to the two torts as a single tort, which makes identifying separate standards difficult. *Murray v. Stockton*, No. 3:04-CV-501, 2007 WL 172521, at *8 n.14 (E.D. Tenn. Jan. 18, 2007) ("The causes of action for false arrest and false imprisonment have been stated to be distinguishable in terminology only, the difference between them lying in the manner they arise."). However, those cases that refer to the torts as essentially the same often do so because the false imprisonment results from the false arrest. *See Lee v. Ritter*, No. 1:02-CV-282, 2005 WL 3369616, at *20 (E.D. Tenn. Dec. 12, 2005) ("In the instant case, the claims of false arrest and false imprisonment are the same since the alleged false imprisonment arises out of the alleged false arrest by the defendant officers.") (citing *Walker v. Schaeffer*, 854 F.2d 138, 142 (6th Cir. 1988)).

In Tennessee, an arrest is "the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest." *State v. Crutcher*, 989 S.W.2d 295, 301 (Tenn. 1999). No arrest occurred here. Although the Court has found a question of fact regarding constitutional seizure, an arrest under Tennessee law requires more restraint than a constitutional seizure. *See id.* at 301 n.10 ("This definition [of constitutional seizure], however, fails to recognize the distinction between 'seizure' and 'arrest,' discussed above. A person may be seized without being placed under custodial arrest."). It is undisputed Ladd never touched Plaintiffs. Moreover, there is no indication he expressed an intent to take Plaintiffs into custody. Martha Millsaps alleges Ladd threatened to take her into custody. However, that threat was conditional on her interfering with the confiscation of the children (*see*

Court File No. 55-5, Martha Millsaps Answers to Interrogatories, p. 29) ("We were both told on the night of August 30 when we attempted to have some dialogue with the deputies to 'back off or we will handcuff you and take you to jail.'") (*see also* Court File No. 55-7, Martha Millsaps Dep., p. 22) ("He offered to take me to jail."). Such a conditional threat does not indicate an intention to take the Millsaps into custody.

Because the Court finds the circumstances of this case, although possibly rising to the level of a constitutional seizure, do not rise to the level of an arrest under Tennessee law, summary judgment is appropriate for Officer Ladd on Plaintiffs' false arrest claim. The Court will **GRANT** Officer Ladd's motion on this claim.

### 4. False Imprisonment

False imprisonment requires Plaintiffs to prove: (1) they were restrained or detained against her will by a defendant, and (2) the restraint or detention was unlawful. *Bryant-Bruce v. Vanderbilt Univ., Inc.*, 974 F. Supp. 1127, 1145 (M.D. Tenn. 1997); *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990). This intentional restraint must be without just cause. *B.M.D.* ex rel. *Dickerson v. Knox Cnty.*, No. 3:07-CV-73, 2009 WL 677776, at *13 (E.D. Tenn. Mar. 10, 2009) (citing *Newsom v. Thalhimer Bros., Inc.*, 901 S.W.2d 365, 367 (Tenn. Ct. App. 1995)); *see also Bryant-Bruce*, 974 F. Supp. at 1145 ("Under Tennessee law, false imprisonment is the intentional restraint or detention of another without just cause.") (citing *Newsom*, 901 S.W.2d at 367). Officer Ladd argues he did not detain Plaintiffs and is entitled to summary judgment. However, the Court concludes a question of fact remains on this claim for the same reasons the unlawful seizure claim may go forward.

Plaintiffs also cite Tenn. Code Ann. § 39-13-302 in their brief, which is Tennessee's criminal

statute for false imprisonment. The Court declines to read the statute to imply a private right of action. *See Buckner v. Carlton*, 623 S.W.2d 102, 105 (Tenn. Ct. App. 1981) *superseded by statute on other grounds*, Act of May 24, 1984, ch. 972, 1984 Tenn. Pub. Acts 1026 ("But the factor weighing most heavily against an implied right of action is that the oppression statute as well as the criminal statutes concerning conspiracy and solicitation are intended for the protection of the general public. When courts have implied a private right of action from a criminal statute, the statute invariably is intended to protect a particular class of people."); *see also Madkins v. State*, No. W2001-03002-COA-R3-CV, 2002 WL 1162338, at *2 (Tenn. Ct. App. May 29, 2002) (holding § 39-13-202 does not imply a private right of action against the State). However, Plaintiffs allege negligence *per se* on the part of Officer Ladd. Courts have allowed violations of Tenn. Code Ann. § 39-13-302 to serve as the basis of a negligence *per se* claim. *See Massey v. Hess*, No. 1:05-CV-249, 2007 WL 2725890, at *16 (E.D. Tenn. Sept. 17, 2007) (denying out-of-state defendant's motion to dismiss the plaintiff's negligence *per se* allegation for a number of statutes including § 39-13-202).[20]

The Court will **DENY** Officer Ladd's motion for summary judgment on this issue.

### 5. Official Oppression

Officer Ladd claims there is no private right of action for a official oppression under Tenn. Code Ann. § 39-16-403, which is a criminal statute. Officer Ladd is correct in this regard. *See Dirks v. Tudors*, No. E2008-01384-COA-R3-CV, 2009 WL 1372180, at *2 (Tenn. Ct. App. May 18, 2009). However, courts have allowed official oppression claims to proceed under a negligence *per*

---

[20] The Court notes *Massey* came to a contrary conclusion on the issue of municipal liability. However, *Massey* preceded *Campbell* and *Johnson*, which clarified the applicability of the civil rights exception.

*se* theory. *See Corvin v. Bice*, No. 1:05-CV-219, 2007 WL 776501, at *7 (E.D. Tenn. Mar. 9, 2007); *Massey*, 2007 WL 2725890, at *16.

Accordingly, Plaintiffs may assert that Defendants' alleged violation of Tenn. Code Ann.§ 39-16-403 constitutes negligence *per se*. Officer Ladd's motion will be **DENIED** on this ground.

### 6. Trespass

Trespass is "unauthorized entry upon another's real property." *Arbuckle v. City of Chattanooga*, 696 F. Supp. 2d 907, 931 (E.D. Tenn. 2010) (citing *Morrison v. Smith*, 757 S.W.2d 678, 681 (Tenn. Ct. App. 1988)). As the Court has discussed, the entry into Plaintiffs' homes was made without a warrant or exigency. Accordingly, Officer Ladd's motion will be **DENIED** on this claim.

### 7. Libel

Plaintiffs also allege Officer Ladd committed libel when he distributed a letter written by Bridget Millsaps to unknown individuals. They also allege he libeled them during his statement at the city council meeting. Under Tennessee law, to establish a claim for defamation of a non-public figure, Plaintiffs must show: 1) a party published a statement; 2) with knowledge that the statement was false or defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999). "'Publication' is a term of art meaning the communication of defamatory matter to a third person." *Id.* at 571-72 (quoting *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.*, 876 S.W.2d 818, 821 (Tenn. 1994)). Libel is written defamation, whereas slander is spoken defamation. *Davis v. The Tennessean*, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001).

Here, with respect to the allegedly distributed letter, Plaintiffs have presented insufficient

evidence to withstand summary judgment. Although Bridget Millsaps' letter has been provided to the Court, the only evidence of Officer Ladd's connection to the letter is Plaintiffs' testimony they were told by third parties Officer Ladd distributed the letter. Such inadmissible hearsay evidence is not enough to establish the element of publication. It is telling Plaintiffs failed to depose or otherwise obtain a statement or affidavit from any individual who witnessed this dissemination.

With regard to Plaintiffs' claim Officer Ladd libeled them at the city council meeting, the Court notes that *spoken* defamation is slander. An action based on slander must be commenced within six months of the utterance of the defamatory statement. Tenn. Code Ann. § 28-3-103; *see Quality Auto Parts Co., Inc.*, 876 S.W.2d at 821 (noting slander accrues from utterance of the alleged defamatory material). The alleged slander in this case occurred on September 14, 2010. This action was filed on August 25, 2011, well outside the applicable statute of limitations. However, Plaintiffs allege, and Defendants do not deny, the city council meeting was broadcast on local television. Tennessee courts consider some television broadcasts to be libel, especially when based on written scripts. *Eisenstein v. WTVF-TV, News Channel 5 Network, LLC*, 389 S.W.3d 313, 316-17 (Tenn. Ct. App. 2012).

The Court need not consider whether Officer Ladd's unscripted statement at the city council meeting constitutes slander or libel because Plaintiffs have not identified what portion of the speech is defamatory. A plaintiff need not state the allegedly defamatory statement verbatim, but it must apprise the defendant of the substance of the statement. *See Handley v. May*, 588 S.W.2d 772, 775 (Tenn. Ct. App. 1979) ("Where the substance of the slanderous utterance is pled along with notice of the time and place of the utterance the defendant is apprised of the allegations that he must defend against."). However, "if the complaint is so vague that a court cannot ascertain the nature of the

alleged slander, it is insufficient." *Id.*

The Court is simply unaware which statement Plaintiffs contend was defamatory. The Third Amended Complaint alleges Officer Ladd lied at the meeting, and then alleges he "read" and disseminated libelous materials, which the Court assumes refers to Bridget Millsaps' letter. Officer Ladd, however, did not read any materials at the meeting and no mention of the letter was made. In response to Officer Ladd's motion for summary judgment, which notes this inadequacy, Plaintiffs merely claim the "[v]ideo statements against Bishop Millsaps clearly are under the libel requirements of Tennessee law" and otherwise generally allege Officer Ladd libeled them without noting what false statement was made (Court File No. 55, pp. 6, 10, 12). Plaintiffs have failed to identify what statement Officer Ladd made that he knew was false or that he made with reckless disregard of the truth. Plaintiffs have even failed to identify the substance of this alleged defamation.

Accordingly, Officer Ladd's motion for summary judgment will be **GRANTED** on Plaintiffs' libel claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT** Chief McNeece's and Monteagle's motion for summary judgment (Court File No. 44). The Court will **GRANT IN PART** and **DENY IN PART** Officer Ladd's motion for summary judgment (Court File No. 41). This case will proceed on Plaintiffs' unlawful seizure, false imprisonment, official oppression, and trespass claims against Officer Ladd.

**An order shall enter.**

/s/_____
**CURTIS L. COLLIER**

43

**UNITED STATES DISTRICT JUDGE**